UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RONNIE MINNIFIELD,
    Plaintiff,

v.                       CASE NO. 3:17cv1196(DFM)

NANCY BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

RULING AND ORDER

The plaintiff, Ronnie Minnifield, seeks judicial review pursuant to 42 U.S.C. § 405(g) of a final decision by the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). The plaintiff asks the court to reverse the Commissioner's decision or, alternatively, remand for a rehearing. (Doc. #19.) The Commissioner, in turn, seeks an order affirming the decision. (Doc. #20.) For the reasons set forth below, the plaintiff's motion is granted and the defendant's motion is denied.[1]

I. Administrative Proceedings

On June 6, 2013, the plaintiff applied for SSI alleging that he was disabled due to auditory hallucinations, schizophrenia,

---

[1] This is not a recommended ruling. The parties consented to the jurisdiction of a magistrate judge. (Doc. #15.)

depression, anxiety, PTSD and diabetes.[2] (R. at 82.) His application was denied initially and upon reconsideration. He requested a hearing before an Administrative Law Judge ("ALJ"). On September 9, 2015, the plaintiff, represented by counsel, testified at the hearing. A vocational expert also testified. On December 8, 2015, the ALJ issued a decision finding that the plaintiff was not disabled. On May 16, 2017, the Appeals Counsel denied review, making the ALJ's decision final. In July 2017, the plaintiff commenced this action. On December 4, 2017, the plaintiff filed a motion for reversal or remand and on February 2, 2018, the defendant filed a motion to affirm.

II. Standard of Review

This court's review of the ALJ's decision is limited. "It is not [the court's] function to determine de novo whether [the plaintiff] is disabled." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). The court may reverse an ALJ's finding that a plaintiff is not disabled only if the ALJ applied the incorrect legal standards or if the decision is not supported by substantial evidence. Brault v. Soc. Sec. Admin., 683 F.3d 443, 447 (2d Cir. 2012). In determining whether the ALJ's findings "are supported

---

[2]"SSI payments do not begin until the month after the month in which the application is filed, assuming all eligibility requirements are met." Feliciano v. Comm'r of Soc. Sec., No. 10-CV-3151 JPO, 2011 WL 6399512, at *17 (S.D.N.Y. Dec. 20, 2011). Therefore, the issue is whether the plaintiff was disabled since June 6, 2013, the date of his application.

2

by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)). "Substantial evidence is more than a mere scintilla. . . . It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447 (quotation marks and citations omitted). It is "a very deferential standard of review — even more so than the clearly erroneous standard. . . . The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 447-48. See also Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence.") (internal quotation marks omitted).

III. Statutory Framework

To be "disabled" under the Social Security Act and therefore entitled to benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

3

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses the following five-step procedure to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (internal alterations and citation omitted). "The applicant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

IV. The ALJ's Decision

Following the five step evaluation process, the ALJ first found that the plaintiff had not engaged in substantial gainful activity since June 6, 2013, his application date. (R. at 14.) At step two, the ALJ determined that the plaintiff had severe impairments of an affective disorder and acute myocardial

4

infarction.[3] (R. at 15.) At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ next determined that the plaintiff had

> the residual functional capacity[4] to perform medium work as defined in 20 C.F.R. 416.967(c)[5], except that [he] can have no exposure to extreme heat. He can perform simple, routine repetitive tasks in a setting that does not require strict adherence to time or production quotas. His judgment is limited to simple, work related decisions and he can deal with changes in the work environment limited to simple, work related decisions, He can only have occasional exposure to the public.

(R. at 16.)

Finally, after considering plaintiff's age, education, work experience and RFC, as well as the testimony of the VE, the ALJ found at step 5 that other jobs existed in significant numbers in the national economy that the plaintiff could perform.[6] (R. at 23.)

---

[3] The defendant contends that the ALJ meant to say "acute occipital lobe infarction." (Emphasis added.) (Doc. #20 at 12, n. 7.) The record indicates that the plaintiff had a stroke in 2015 and that a MRI showed an "acute occipital lobe infarct." (R. at 548.)

[4] Residual functional capacity ("RFC") is the most a claimant can do in a work setting despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).

[5] Medium work is defined as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or he can also do sedentary and light work." 20 C.F.R. § 416.967(c).

[6] The last two pages of the ALJ's December 2015 decision - containing information about the VE's testimony and the ALJ's conclusion at step 5 - were blank. The defendant supplemented the

5

Accordingly, the ALJ determined that the plaintiff was not under a disability "since June 6, 2013, the date the application was filed." (R. at 23.)

V. Discussion

The plaintiff argues that the ALJ erred: (1) in failing to find the plaintiff's diabetes a severe impairment at step 2; (2) in evaluating the opinions of the plaintiff's treating psychiatrist; (3) in weighing the medical evidence and determining his residual functional capacity; and (4) at step 5 because the original ALJ's decision was incomplete and alternatively, in concluding that there was work existing in significant numbers that the plaintiff could perform.

A. Step 2

The plaintiff argues that he "suffers from poorly controlled diabetes that should have been found by the ALJ to be a severe impairment." (Doc. #19 at 11.) In support, the plaintiff asserts that his blood sugar readings are "well outside what is considered to be the acceptable range" and demonstrate that his diabetes is "poorly controlled." (Doc. #19 at 12.)

At step two, "[a] claimant has the burden of establishing that [he] has a 'severe impairment,' which is 'any impairment or combination of impairments which significantly limits [his]

---

record on November 30, 2017 with a complete copy of the decision. See doc. #18.

physical or mental ability to do basic work." Woodmancy v. Colvin, 577 F. App'x 72, 74 (2d Cir. 2014). "[M]ere diagnosis of an impairment is not sufficient to establish 'severity' under step two." Cobbins v. Comm'r of Soc. Sec., 32 F. Supp. 3d 126, 133 (N.D.N.Y. 2012).

The ALJ determined that the plaintiff's diabetes was not a severe impairment. In so concluding, the ALJ reviewed the medical record, noting that it reflected that the plaintiff had only one case of syncope.[7] (R. at 611.) The ALJ found that although the plaintiff "has some high A1C[8] levels, his diabetes is well managed with medication." (R. at 15.)

Substantial evidence supports the ALJ's determination. The record demonstrates that the plaintiff generally denied associated symptoms of headache, urinary frequency, polydipsia,[9] feelings of weakness, and/or dizziness. (R. at 318, 323.) When seen by consultative examiner Dr. Kogan in July 2013, the plaintiff reported that he had been diagnosed with diabetes "about 6 years

---

[7] Syncope is a temporary loss of consciousness. Stedman's Medical Dictionary 1887 (28th ed. 2006).

[8] "The A1C test is a blood test that provides information about a person's average levels of blood glucose, also called blood sugar." Nunez v. Colvin, No. 15CIV4957, 2017 WL 684228, at *18 (S.D.N.Y. Feb. 21, 2017). "Current guidelines recommend a treatment goal of less than 7% for diabetic patients." Roberts v. Astrue, No. 10CV0092, 2011 WL 4056067, at *3 (E.D.N.Y. Sept. 12, 2011).

[9] Polydipsia is excessive thirst. Id. at 1534.

ago." He "deni[ed] any numbness in the distal extremities" and "any history of foot ulcers." (R. at 358, 360.) Upon examination, all the plaintiff's systems were normal. He had no tenderness or swelling and had full range of motion throughout all the joints of his upper and lower extremities bilaterally. (R. at 359.) His motor strength was 5/5[10] and he had normal fine finger movements bilaterally. A sensory examination revealed "intact to light touch and pin prick in the upper and lower extremities bilaterally." (R. at 360.) Deep tendon reflexes were normal as was his gait. Dr. Kogan found "no evidence of functional limitations stemming from peripheral neuropathy."[11] He also observed that the plaintiff did not have any foot ulcers. (R. at 360.)

In November 2013, the plaintiff reported "occasional" numbness in his feet. (R. at 373.)

During a psychiatric hospitalization in March 2014, the plaintiff's diabetes was specifically assessed. Upon examination, the plaintiff had "no complaint" and "denie[d] any polydipsia or polyuria.[12] He also "denie[d] lightheadedness, dizziness, headaches, nausea, vomiting, diarrhea, constipation, abdominal

---

[10]Muscle strength is rated on a scale of 0 to 5 with 5/5 indicating normal strength. The Merck Manual 1363 (15th ed. 1987).
[11]Diabetic peripheral neuropathy is a condition where nerve endings, particularly in the legs and feet, become less sensitive. 3 The Gale Encyclopedia of Medicine 1526 (5th ed. 2015).
[12]Polyuria is excessive excretion of urine. Stedman's Medical Dictionary 1887 (28th ed. 2006).

8

pain, chest pain or shortness of breath." (R. at 471.) The plaintiff's neurologic system was normal. (R. at 472.) His motor strength was 5/5 in all extremities.

Treatment notes from April and August 2015 indicated "foot pain neuropathic type" and "tingling of the limbs and numbness." (R. at 667-68, 667.) A 10g monofilament exam[13] was "abnormal" as to both feet and peripheral neuropathy was noted. (R. at 669.)

When examined in May and June 2015, the plaintiff's "review of systems" was normal with the exception of a complaint of polydipsia in June. (R. at 646, 661, 666.) A monofilament exam was normal as to both feet, the appearance of the plaintiff's feet was normal, and there was no evidence of ulcers. (R. at 647, 656.)

At the hearing, the plaintiff testified that he had pain and tingling in his hands and feet. (R. at 37, 49). He further testified that he could pick things up and lift and hold a gallon of milk. In addition, he said that "walk[s] a lot" and has "no trouble in [his] feet." (R. at 38.) On this record, the plaintiff has not met his burden of demonstrating that his diabetes caused more than a minimal limitation in the ability to do basic work activities.[14]

---

[13]"Monofilament testing is used to test for diabetic neuropathy. It measures sensitivity to touch using a soft nylon fiber called a monofilament." Grantz v. Berryhill, No. 5:16CV2033, 2017 WL 9478426, at *20 (N.D. Ohio May 31, 2017).

[14]Further, an ALJ's finding that an impairment is not severe at step two is harmless error when, as here, the ALJ finds other

B.  <u>Treating Physician</u>

The plaintiff next argues that the ALJ failed to give proper weight to the opinions of the plaintiff's treating psychiatrist, Dr. Kinson Lee.

"The SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant. Thus, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." <u>Greek v. Colvin</u>, 802 F.3d 370, 375-76 (2d Cir. 2015).

"[T]he purpose of the treating physician rule [is] to give more weight to medical opinions from [the] treating sources, since these sources are likely to be the medical professionals most able

---

severe impairments and continues with the sequential evaluation, considering the combined impact of all impairments. <u>See</u> <u>Dimauro v. Berryhill</u>, No. 3:16CV1329(WIG), 2018 WL 3872154, at *6 (D. Conn. Aug. 15, 2018). In such a circumstance, "because the ALJ did find several severe impairments and proceeded in the sequential process, all impairments, whether severe or not, were considered as part of the remaining steps." <u>Jones-Reid v. Astrue</u>, 934 F. Supp. 2d 381, 402 (D. Conn. 2012), aff'd, 515 F. App'x 32 (2d Cir. 2013). <u>See, e.g.</u>, <u>Rosa v. Colvin</u>, No. 12CV0170, 2013 WL 1292145 at *7 (N.D.N.Y. Mar. 27, 2013) ("The ALJ's determination that Plaintiff's orthopedic conditions were not severe was based upon substantial evidence and therefore not error in this regard; even if it were error, however, the Commissioner is correct that it was a harmless error" because the ALJ "proceeded beyond step two of the analysis.").

to provide a detailed, longitudinal picture of [any] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." <u>Flynn v. Comm'r of Soc. Sec. Admin.</u>, 729 F. App'x 119, 122 (2d Cir. 2018). "The treatment provider's perspective would seem all the more important in cases involving mental health, which are not susceptible to clear records such as x-rays or MRIs. Rather, they depend almost exclusively on less discretely measurable factors, like what the patient says in consultations." <u>Id.</u>

"[W]hen a treating physician's opinion is not given controlling weight, SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive." <u>Greek</u>, 802 F.3d at 375. "[T]o override the opinion of the treating physician, we have held that the ALJ must explicitly consider, <u>inter alia</u>: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." <u>Greek</u>, 802 F.3d at 375 (quotation marks and citation omitted). "After considering the above factors, the ALJ must comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion." <u>Id.</u> (quotation marks and citations omitted).

11

"This 'requirement of reason-giving' is especially important in cases where, as here, the ALJ renders an unfavorable disposition of the claims at issue." Padilla v. Berryhill, No. 15CIV9312VBLMS, 2018 WL 3598766, at *10 (S.D.N.Y. June 22, 2018). See Snell v. Apfel, 177 F. 3d 128, 134 (2d Cir. 1999) ("A claimant ... who knows that [his] physician has deemed [him] disabled [ ] might be especially bewildered when told by an administrative bureaucracy that [he] is not, unless some reason for the agency's decision is supplied."). "The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Greek, 802 F.3d at 375 (quotation marks and citations omitted).

In this case, the plaintiff has a long history of depression and auditory hallucinations. Dr. Lee began treating the plaintiff in 2009 after the plaintiff's psychiatric hospitalization for suicidal ideation. (R. at 74.) Dr. Lee diagnosed the plaintiff with "Major Depressive Disorder, recurrent, severe with psychosis." (R. at 388.) From 2009 through 2015, Dr. Lee monitored the plaintiff closely and saw him continuously, sometimes monthly, for medication management. Dr. Lee prescribed the plaintiff several psychiatric medications, including Celexa and Wellbutrin for depression, Thorazine, an anti-psychotic, and Risperidone and Risperdal Consta (an injectable medication), which are used for the treatment of schizophrenia. (R. at 358.) During

12

the course of his treatment of the plaintiff over the years, Dr. Lee added various medications and adjusted dosages in response to the plaintiff's symptoms.

Dr. Lee submitted various documents to the SSA.[15] The earliest is a January 10, 2014 SSA form entitled "Mental Residual Functional Capacity Statement." (R. at 394 - 400.) On the form, Dr. Lee listed the plaintiff's diagnosis as "Major Depressive Disorder, recurrent, severe with psychotic behaviors." As to the plaintiff's prognosis, Dr. Lee stated that the plaintiff suffered from "chronic mental illness, stabilized with medications." The form asked the examiner to

> rate your patient's Mental abilities to function independently, appropriately, effectively and on a sustained, consistent, useful and routine basis, without direct supervision or undue interruptions or distractions—8 hours per day, 5 days per week—in a regular, competitive work setting for more than six consecutive months. Note: limitations do not include a one-hour lunch break or two 15 minute breaks, one in the morning and afternoon; or limitations due to substance or alcohol abuse.

The form had four categories: Understanding and Memory; Sustained Concentration and Memory; Social Interaction; and Adaptation. Under these categories were twenty specific work-related mental functional abilities ("mental abilities"). The examiner was asked

---

[15]Dr. Lee's opinion is especially significant as he was the only treating source who submitted opinion evidence.

to assess the plaintiff as to these "mental abilities" using the following rating scale:

> Category I: Does not preclude performance of any aspect of the job;
> Category II: Precludes performance for 5% of an 8-hour day;
> Category III: Precludes performance for 10% of an 8-hour day
> Category IV: Precludes performance for 15% or more of an 8-hour day.

(R. at 394.)

Dr. Lee left blank all of the 11 "mental abilities" listed under the first two categories of "Understanding and Memory" and "Sustained Concentration and Memory." Written across this section is a notation that says "have not assessed in work environment." (R. at 395.) Dr. Lee also did not rate the plaintiff as to the 5 "mental abilities" listed under the third category, "Social Interaction." There is a handwritten notation "Pt appropriately social at MD office." For the final category, "Adaptation," and its "mental abilities," there is a handwritten notation "NA in medical office." (R. at 396.)

The SSA form also asked the physician to indicate (1) what percentage of a work day the patient would be "precluded from performing" a job or "off task" due to physical and mental limitations; (2) how many days per month the patient would be absent from work as a result of his physical and/or mental impairments; (3) how many days the patient would be unable to

14

complete an 8 hour work day; and (4) compared to an average worker, how efficiently could the patient be expected to perform a job 8 hours a day, 5 days a week on s sustained basis. Dr. Lee drew a line through these questions and wrote "Pt has chronic medical and mental conditions affecting skills to work 8 hrs/day 5 days/wk." (R. at 396.) In response to the question "Do you believe within a reasonable degree of medical certainty, that your patient, because of his/her impairments and physical and/or mental impairments, is unable to obtain and retain work in a competitive work setting - 8 hours per day, 5 days per week - for a continuous period of at least 6 months?," Dr. Lee answered "Yes" and indicated that his opinion was based on the plaintiff's "history and medical file and progress and office notes." (R. at 397.) Dr. Lee wrote that the plaintiff

> has been unable to work in the past due to symptoms of depression including decreased motivation, sleep [and] energy and anxiety. Pt has a history of hearing command voices to harm himself. With medication, symptoms have been stabilized yet Pt continues to report chronic medical conditions causing difficulty in achieving optimal level of functioning day to day.

(R. at 397.)

Dr. Lee submitted another form - a similar but different form entitled "Medical Opinion re: Ability to Do Work-Related Activities (Mental)" also dated January 10, 2014. Again, Dr. Lee drew a line through the listed "mental abilities" and did not assess the plaintiff as to them. Rather, there is a handwritten

15

note stating "Pt has chronic mental and medical issues which interfere with skills needed for 8 hr work day 5x/wk." (R. at 398-400.)

In a letter to plaintiff's counsel dated May 13, 2014, Dr. Lee stated that he had been treating the plaintiff since 2009 and saw him "every 2 - 4 weeks or as needed depending on the effect of the medications on symptoms of mood and thought disorder." (R. at 466.) He explained that the plaintiff was being treated for "symptoms of major depressive disorder, severe with psychotic behaviors and cocaine abuse, nondependent, unspecified" and listed his medications. Dr. Lee opined:

> [The plaintiff] is unable to work due to symptoms of illness including poor concentration, poor motivation, anxiety, poor ability to stay awake and alert for more than two hours, and a history of command hallucinations to harm himself. [The plaintiff's] symptoms have stabilized with medications yet he continues to exhibit medical and psychiatric conditions causing difficulty in achieving optimal level of functioning day to day. It is my professional opinion that [the plaintiff] has a chronic illness which precludes him from working.

(R. at 466.)

The ALJ accorded Dr. Lee's opinions "partial weight", explaining that "his notes are illegible so the rational[e] for his reasoning is unknown" and "cannot be discerned." The ALJ added that "the claimant appeared to be doing well on medication." As further grounds for not according more weight to Dr. Lee's opinion, the ALJ stated that "Dr. Lee could not articulate the severity of

16

the claimant's impairments specifically." Finally, the ALJ stated that Dr. Lee's opinions "do not account for alcohol and cocaine use." (R. at 19.)

To the extent that the ALJ gave cursory treatment to Dr. Lee's on the grounds that his treatment notes were illegible, "the ALJ had an affirmative obligation to develop a complete and detailed record by reaching out to Plaintiff's treating source for additional evidence or clarification." Soto v. Comm'r of Soc. Sec., No. 17-CV-2377 (PKC), 2018 WL 3241313, at *2 (E.D.N.Y. July 2, 2018)(where plaintiff's medical records from his pain management specialist were illegible, the ALJ had a duty to request clarification or supplementation of the record). See, e.g., Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir. 1975) ("Where the medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation."); Owens v. Berryhill, No. 2:17-CV-2632 (ADS), 2018 WL 1865917, at *8 (E.D.N.Y. Apr. 18, 2018) (court remanded because the ALJ should have contacted the treating physician "to decrypt those portions of his treatment notes that the ALJ found to be illegible"); Johnson v. Comm'r of Soc. Sec., No. 16CIV1729CSPED, 2017 WL 4155408, at *10 (S.D.N.Y. Sept. 18, 2017)(court remanded where ALJ discounted the plaintiff's treating physician's opinion because his treatment records were indecipherable because "[i]n such circumstances the ALJ should to

17

seek clarification or even transcription of the treating doctor's notes."); Silva v. Colvin, No. 6:14-CV-06329 MAT, 2015 WL 5306005, at *5 (W.D.N.Y. Sept. 10, 2015)(remanding for transcription of doctor's illegible notes)(collecting cases); McClinton v. Colvin, No. 13-CV-8904 (CM)(MHD), 2015 WL 5157029, at *23 (S.D.N.Y. Sept. 2, 2015) ("When records produced are illegible but relevant to the plaintiff's claim, a remand is warranted to obtain supplementation and clarification."); Stewart v. Colvin, No. 13-CV-0314, 2015 WL 4546050, at *8 (W.D.N.Y. July 28, 2015) ("[P]laintiff's treating physician's notes were contained within the record but were illegible ... the ALJ should have endeavored to clarify the treatment notes rather than simply ignore them and conclude that no evidence in the record supported plaintiff's reports of her symptoms."); Jackson v. Barnhart, No. 06-CV-0213, 2008 WL 1848624, at *8 (W.D.N.Y. Apr. 23, 2008) ("The [ALJ] should have obtained more detailed and clearer statements from [the claimant's] treating physician, especially since the medical records which appear in the administrative record are often illegible.").

In addition to the illegibility of the treatment notes, the ALJ discounted Dr. Lee's opinion on the grounds that he "could not articulate the severity of the [plaintiff's] impairments," presumably referring to the fact that Dr. Lee did not complete the portion of the SSA forms asking him to evaluate the plaintiff's specific mental abilities. It is unclear if Dr. Lee was familiar

18

with the SSA's disability evaluation program and that he needed to opine regarding the plaintiff's capacity as to each of the specific, enumerated mental abilities. Dr. Lee clearly indicated that, in his professional medical opinion, the plaintiff was unable to work in a competitive work setting 8 hours a day, 5 days a week because of his impairments. (R. at 397.) Rather than discount Dr. Lee's opinion because he did not complete the form properly, the ALJ should have developed a complete and detailed record by reaching out to Dr. Lee for additional information. "[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel'. . . ." Id.

For these reasons, the court remands this action with instructions to the ALJ to develop the record, determine the appropriate weight to accord to Dr. Lee's opinion, and, if controlling weight is not assigned, specifically articulate the reasons supporting the weight given the treater's opinion.[16] In

---

[16] In light of the foregoing, I need not discuss plaintiff's other arguments. See Johnston v. Colvin, No. 3:13CV73(JCH), 2014 WL 1304715, at *34 (D. Conn. Mar. 31, 2014) (where case reversed and remanded for re-weighing of evidence in light of ALJ's improper application of treating physician rule, district court need not reach merits of plaintiff's remaining arguments).

19

rejecting this portion of the ALJ's decision, the court expresses no opinion as to whether the plaintiff is disabled. Rather, the court finds only that the ALJ erred in weighing the opinion of the plaintiff's treating physician.

VI. Conclusion

For these reasons, the plaintiff's motion to reverse and/or remand the Commissioner's decision (doc. #19) is granted and the defendant's motion to affirm the decision of the Commissioner (doc. #20) is denied.

SO ORDERED at Hartford, Connecticut this 14th day of September, 2018.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge